### Citizens Life Insurance Company v. Coleman.

(Decided June 6, 1912.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Second Division).

1. Life Insurance—"Binding Receipt."—Where a receipt given to the applicant by the agent of the company who secured the application, set out that he had "received of.........one note for $36.60, in full for the first annual premium on $2,500, of insurance, the insurance will be in force from the date of approval of the application by the Medical Director. In case a

policy shall not be issued, the money paid will be refunded," it constituted a binding contract between the insurance company and the applicant, conditioned upon the acceptance of the application by the company. And, when the application was accepted, the company became liable for the insurace contracted for until it tendered to the applicant a policy such as he applied for. But, when such tender is made, the contract created by the receipt terminates, unless the insured pays the amount he agreed to pay as a part of the application or the company by its conduct continues the insurance in force.

2. Life Insurance—Facts Stated.—When the company tendered to the applicant the policy he contracted for, and demanded payment of the premium specified in the application, which the applicant failed or refused to pay, the company had the right to surrender to the applicant the note taken for the first premium and elect to declare the contract of insurance at an end. But, when the insured refused to pay the note given for the first premium and the agent took from him a new note to be sent to the company for its acceptance or rejection, in the meanwhile retaining the policy, and the company notified the insured that he must submit to a re-examination, the policy was continued in force by virtue of the receipt until the applicant had a reasonable time in which to submit to an examination; and as the insured died before the expiration of a reasonable time, the beneficiary had a right to recover the amount of the policy.

3. Life Insurance—Pleadings.—Where a binding receipt was given by the company, but the policy that was issued was not delivered to the insured, in a suit to recover the amount of the insurance, the action should have been brought on the receipt as well as the policy; but the fact that the action was based on the policy alone ·did not prejudice the substantial rights of the company, and the variance between the pleadings and proof was not fatal to a recovery.

HELM BRUCE, BRUCE & BULLITT for appellant.

LIEBER & LINCOLN, R. FRANK PEAK and W. S. HEIDEN-BERG for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On December 6, 1905, Howard D. Coleman made application to the appellant insurance company for insurance on his life in the sum of $2,500, for the benefit of the appellee, Emma E. Coleman. At the time he made the application, the agent of the company who solicited the insurance gave him a receipt reading:

"Received of Howard D. Coleman one note

for $36.60, in full for the first annual premium on $2,500 insurance. The insurance will be in force from the date of approval of the application by the Medical Director. In case the policy should not be issued, the money paid will be refunded: Provided a complete application and examination for such insurance is made and submitted to the company at its home office, and the applicant if he shall not receive his policy within thirty days from date hereof shall notify the company. Not binding unless countersigned by duly authorized agent of the company, and stamped in red ink with same number as the application signed by the applicant.''

This receipt was signed by M.• E. Lasley, the soliciting agent.

The application signed by Coleman at the time the receipt was given to him stipulated that:

''If the amount of the premium on the insurance herein applied for is not paid when this application is made, no contract of insurance shall be deemed made, and no liability on the part of said company shall arise until a policy shall be issued and delivered to me, nor until the first premium thereon shall be actually paid while I am in good health.''

This stipulation in the application is in direct conflict with the conditions of the receipt, as the receipt recites that Coleman executed a note for the first annual premium and that the insurance should be in force from the date of the approval of the application by the Medical Director and the agent, who solicited the insurance, testifies without contradiction that he had authority to take a note in place of money when he issued the receipt and the application was made. It is not, therefore, necessary that we should notice further the stipulation in the application, indeed, counsel for the company does not rely on the condition mentioned in the application as a defense to the suit.

It will be observed that although the receipt states that Coleman executed his note for $36.60 in full for the first annual premium, it does not show when this note matured or was payable. It is further a conceded fact that may here be noticed that this note executed to the company by Coleman and delivered to the agent by him was in the possession of the company at the time Coleman died.

On the 30th of December, 1905, the company issued

to Coleman a policy of insurance such as he had applied for, and this policy was put in the hands of Lasley, the agent who had secured the insurance, to be delivered to Coleman. In this policy it was provided among other things that:

"If any note or other obligation given for the first year's premium or any part thereof on this policy shall not be paid when due, this policy contract shall be and become null and void, without any notice or action of the company, notwithstanding any receipt which may have been given for such premium."

It appears that the agent, Lasley, to whom the policy was given, when issued to be delivered to Coleman upon payment of his note, had not delivered to him the policy on January 15, 1906, and on this date the company sent the policy and the note to George B. Cooper, another one of its agents at Stanford, Ky., to be delivered to Coleman, at the same time writing to Cooper this letter:

"I am sending you herewith the policy of Howard D. Coleman for $2,500, annual premium $36.60. With the other papers is a note for this amount, payable on the delivery of the policy." * * *

Not receiving any answer to this letter or hearing from Cooper, the company again on February 6, 1906, wrote him as follows:

"On January 15th, we sent you a policy of Howard D. Coleman for $2,500, annual premium $36.60, together with a note payable on the delivery of the policy. We have heard nothing from you in regard to this matter, and Mr. Lasley, who wrote the policy, says Mr. Coleman has been after him to know why it has not been delivered." * * *

About the 7th of May, 1906, Cooper testifies that he had the first interview with Coleman that he had been able to have since receiving the letters written to him by the company, and that in this interview he told Coleman that he had the policy, when Coleman replied that he did not know whether he would take it or not, that the company had been slow about issuing it, and that he did not then have the money to pay the note that he had executed when he made the application. Cooper then said to him that he could probably fix it without the payment of the money, if Coleman would execute a new note for the amount of the premium. Thereupon Coleman proposed to execute a note payable in six months, when

Cooper said he did not know whether the company would accept a six-months' note or not, but he would take the note and send it to the company, and if it was accepted by the company he would deliver him the policy, Cooper to retain the policy until he had been advised by the company. He says the understanding was this, that "I would hold the policy to see whether the company would accept this note or not (that is, the six-months' note that I filled out)." On May 10, 1906, a few days after this conversation with Coleman, Cooper wrote the company this letter:

"After several months I finally saw Howard D. Coleman and got his note due and payable in six months for his premium on policy issued on December last. This was the best I could do with him; so, the company can do as they like about the matter. It was understood with us that I hold the policy until I hear from the company. Now, if this is not satisfactory, return me the note and I will send you the policy."

With this letter Cooper enclosed to the company the note executed to him by Coleman, which reads as follows:

"Stanford, Ky., May 7, 1906. Six months after date I promise to pay Geo. B. Cooper thirty-six dollars and sixty cents ($36.60) value received; negotiable and payable at the Lincoln County National Bank of Stanford, Ky., with interest at the rate of six per cent per annum from date until paid."

The only endorsement on this note is the name of George B. Cooper on the back thereof.

On May 16, 1906, the company wrote Cooper the following letter:

"We wish to acknowledge receipt of your favor of May 10th, enclosing note for $36.60 in payment of premium on the above policy. We note what you say in regard to statement about this premium, and wish to advise before we can accept this note it will be necessary for Mr. Coleman to submit to an examination and we enclose herewith Health Certificate in blank form for the doctor. Please have Mr. Coleman call on Dr. A. C. Foster for the examination. The fee for the examination will be two dollars, which Mr. Coleman will be expected to pay Dr. Foster."

Cooper further testifies that he saw Coleman in a few days after receiving this letter and either showed

him the letter or told him its contents, and also advised him that if he could not get Dr. Foster to make the examination, to have it made by Dr. Reed, whose examination would be satisfactory to the company. This was the last conversation that ever took place between Cooper and Coleman, or indeed between Coleman and any person—so far as the record shows—concerning this policy, as, on the 28th of May, 1906, Coleman was killed in a railroad accident and at the time of his death had never submitted to a re-examination.

When Coleman died, the policy was in the possession of Cooper, and the company had possession of the note for $36.60 given when the application was made, as well as the note for a like amount given to Cooper.

The company declining upon demand to pay the insurance, this suit was brought by the beneficiary to recover the amount of the policy, and the law and facts being submitted to the court, a judgment was given against the company for the amount of the policy. A reversal is asked by the company upon two grounds: First, because Coleman had no insurance in the company at the time of his death, and second, because the judgment was not authorized by the pleadings.

Taking up these questions in the order named, we do not find any difficulty in the case from the date of the application to the time of the first conversation between Cooper and Coleman, in which Cooper informed Coleman that he had his policy to be delivered upon the payment of the premium. There can be no doubt that if Coleman had died at any time between the acceptance of the application by the Medical Director of the company and the tender to him of the policy in compliance with the terms of the application that the company would be liable for the amount of the policy, as the receipt provided that "the insurance will be in force from the date of the approval of the application by the Medical Director." The question to be decided then is, did what occurred at the time of this first interview between Coleman and Cooper, and what afterwards happened as a result of it, have the effect of discharging the company from the liability it assumed when the application was accepted and that without doubt continued to exist up to the time of the first conversation between Cooper and Coleman.

It is insisted by counsel for the company that when it

tendered to Coleman about May 7, 1902, the exact kind of policy that he applied for, and demanded of him the payment of the note that he executed when the application was made, the failure or refusal—it being immaterial which—of Coleman to pay the note extinguished the liability of the company created by the receipt that it had given to Coleman when the application was made. Or, in other words, that the receipt was only intended to protect Coleman if his application was accepted until the company had time and opportunity to issue and tender to him the policy he applied for; and, that when it did issue and tender to him this character of policy, and demand the premium which he refused to pay, the contract rights and liabilities of the parties under the receipt terminated.

The further argument is made that when Coleman declined to pay the premium note and made an offer to the company to execute another note for the premium payable in six months, that this constituted a new and distinct proposition for insurance upon the part of Coleman to be accepted or rejected by the company in its discretion, and that as it refused to accept it unless Coleman submitted to a re-examination, which it is conceded he never did, no new liability was created by virtue of this new proposition.

A stipulation in the policy providing that:

"If any note or other obligation given for the first premium or any part thereof on this policy shall not be paid when due, this policy contract shall be and become null and void without any notice or action of the company, notwithstanding any receipt given for such premium," is also relied on to defeat the recovery of the insurance. We do not, however, attach much importance to this condition in the policy. We think the rights of the parties are to be determined by the conditions of the receipt and not by this stipulation in the policy. The receipt constituted the initial contract between the par ties, and the policy issued by the company which was never delivered to Coleman, did not under the facts of this case alter or modify its conditions.

Coming back now to the receipt—the company by its terms agreed that the insurance would be in force from the date of the approval of the application by the Medical Director, until such time as the contract was fully executed by the delivery of the policy to Coleman and

the payment by him of the premium agreed upon. When the company through its agent in May, 1906, tendered to Coleman the policy and demanded payment of the premium note, it had the right then and there upon the failure or refusal of Coleman to perform his part of the contract by the payment of the note to deliver to Coleman his note, and elect to declare the policy canceled and the contract for insurance at an end. It was under no obligation to carry the policy any longer for the benefit of Coleman or to extend to him any other days of grace. It also had the right to elect to prolong the life of the policy, and this we think it did by retaining the note executed when the application was made, by failing to inform Coleman that the contract was canceled, and by receiving from him a new note for the amount of the premium, although this last-mentioned note was not at that time accepted by it in satisfaction of the premium. By this course of dealing, the company reasonably led Coleman to believe that all he had to do to continue the life of the policy for one year was to submit to a re-examination; and from the testimony as to the condition of his health at this time, it is apparent that a re-examination would not have disclosed any reason why the company would reject him as an unsuitable risk. The conduct of the company manifested a disposition on its part not to terminate the contract or cancel the insurance, but, on the contrary, to continue the insurance for the year covered by the premium upon the condition that Coleman submitted to a re-examination. The time in which this re-examination should take place was not agreed upon. There was no date fixed when the contract should terminate if Coleman in the meantime failed or refused to submit to a re-examination; and, as Coleman died within some ten days after being informed that he must submit to a re-examination, it cannot be said that he had delayed having the examination for an unreasonable length of time after being informed that it was necessary.

Upon this point we may further amplify our views by adding what the trial judge in overruling the motion for a new trial well said:

"It does not apppear from Cooper's version of the conversation that he ever tendered the note or tendered the policy or gave to Coleman any intimation that his rights terminated by reason of that conversation.

On the contrary, the agent of the company himself suggested to Coleman that he give a six-months' note and agreed with Coleman that he, the agent, would hold the policy pending negotiations as to whether or not the time for payment would be extended. It will be observed in the letter of May 10, of Cooper to the company, transmitting the six-month's note, that nothing is said about the termination of the risk, but it is manifest that both Cooper and Coleman believed that no status had been changed up to that time.  *  *  *  It is beyond question that the company had the right to say to Coleman 'we will carry this policy no longer; unless you pay this note now, the matter is at an end;' but, it did not do so. It had the right on May 16th to notify Coleman that it would not extend its liability further; and if he wanted to get a health certificate that he could understand he was not insured while he was making an effort to do so; but this was not done.  *  *  *  It seems to the court that it devolved upon the company if it had the purpose to relieve itself of its then existing liability to so notify Coleman in order that he, knowing that his insurance was about to be forfeited, could either get the money by some extra effort or turn to some other company that would perhaps be ready and willing to give him insurance on credit. Practically a week elapsed after the last conversation between Cooper and Coleman before Coleman's death occurred. The company had Coleman's two notes. It had never informed him that the risk on his life that the company was carrying was terminated, and having the right to do this, the failure to do it seems to the court to manifest a disposition on the part of the company to hold on to Coleman as a risk and let him get the health certificate and let his other note which was endorsed by Cooper mature later.  *  *  *  It seems to this court that where an insurance company by contract with the insured assumes a risk upon his life, not for a definite time but until the premium is paid, that when the obligation once begins to run, the insurance company if it desires to terminate it must do so by clear, distinct and unmistakable course on its part, either by actual notice to the insured, or by such conduct as makes it clear that the right of the insured has been terminated by the company, so that the insured may understand as well as the insurer that

the obligations on the one side and the other are at an end.''

But, assuming that the company was liable, as we think it was, it is strongly insisted that the pleadings of the plaintiff were not sufficient to support the judgment rendered. The action was brought upon the theory that a policy had been issued to Coleman, and that the company had declined to pay the amount stipulated in the policy, the receipt not being relied on in the petition. And, it is said that the recovery was allowed on the sole ground that the company was liable by virtue of the receipt it had issued, and not on account of the policy. It is, therefore, insisted that there is a fatal variance between the pleadings and the evidence upon which the judgment was entered. While we are of the opinion that the petition should have set out the receipt, as well as the policy, and have sought a recovery upon the conditions of each, it is manifest that the failure to plead the receipt as a ground of recovery did not at all prejudice the rights of the company. The receipt itself could not under the facts of this case have been made the basis of the action, as it is admitted that the company did in fact issue a policy. It was the issual of the policy after the approval of the application by the Medical Director that in connection with the receipt constituted the ground upon which the plaintiff was entitled to recover. The suit was in fact an action to recover on the policy, as a policy had been issued; and while it developed in the evidence that the right of recovery depended more on the conditions of the receipt than on the terms of the policy, it is nevertheless true that the amount sought to be recovered was the sum that the company in the policy that it had issued agreed to pay in the event of the death of the insured. While, under technical rules of pleading, the objections raised by counsel for the company would be well taken, we are not disposed to permit a meritorious claim to be defeated by the application of technical rules, when it is apparent that the rights of the company were not prejudiced by the failure to set out as fully as should have been done the grounds upon which a recovery was sought.

Wherefore, the judgment is affirmed.